**Application of Lloyd Crosser FELTON.**

Patent Appeal No. 8973.

United States Court of Customs and Patent Appeals.

Sept. 20, 1973.

Pierce, Scheffler & Parker, Washington, D. C., attorneys of record, for appellant; Ralph E. Parker, Washington, D. C., of counsel.

S. Wm. Cochran, Washington, D. C., for the Commissioner of Patents; R. V. Lupo, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN and LANE, Associate Judges, and ALMOND, Senior Judge.

ALMOND, Senior Judge.

This is an appeal from the decision of the Patent Office Board of Appeals sustaining the examiner's rejection of claims 5 and 8–10 of appellant's application [1] entitled "Dropper and Stirrer Dispensing A Single Drop." We reverse.

### Invention

Appellant's invention is depicted in Figs. 1 and 2 of the drawings:

The invention is described in the specification as follows:

In particular, the one-piece article [10] is formed from a tube of resilient, essentially unplasticized, plastic material having hydrophobic properties and being inert to blood or other liquid to be dispensed thereby. One end of the tube is open and is cleanly cut at right angles to the major axis of the tube. It is this open ended part of the tubular piece which constitutes the dropper of the combined dropper-stirrer article. The opposite end is closed, being sealed shut a short distance (e. g., two-thirds to one-third of an inch) from the terminus of the tubular piece; the sealed flat end portion [12], which may lie in the same plane as that in which lies the major axis of the tube, constitutes a paddle-like stirrer for distributing a drop of liquid which has been provided through use of the remote end of the combined dropper-stirrer article.

As mentioned above, the tube is formed, by extrusion, from a resilient, hydrophobic, essentially unplasticized

1. Serial No. 721,299 filed April 15, 1968.

plastic material. Preferably, the specific plastic material used in forming the aforesaid tube is pure virgin polypropylene, but other plastic materials, such for example as polyethylene, and even polyethylene-coated paper, have been found to be operable. Relatively hydrophyllic materials, such for example as cellulose acetate or polyvinyl chloride or polyvinyl acetate, are least desirable. The plastic material should be transparent and may be lightly colored or be colorless. The tube has an internal diameter and a wall thickness which—in conjunction with the resiliency of the material itself—conspire to make the tube readily squeezed shut by pressure between a thumb and a forefinger of a technician and to promptly return to original tubular cross-sectional configuration when pressure on opposite sides thereof is released. In the case of one specific formulation of polypropylene, the tube formed therefrom is 5.0 inches in length and has an internal diameter of $0.152 \pm 0.0025$ inch and a wall thickness of $0.0065 \pm 0.0005$ inch, and is adapted to dispense a volume of approximately 0.05 ml. of plasma or serum.

Claim 9 is the broadest claim in the case and reads as follows (subparagraphing ours):

9. A disposable liquid dispensing device for delivering a single drop of liquid of accurate volume, said dropper

consisting of a unitary cylindrical tube having a uniform wall thickness throughout and formed of a resilient material which is inert to and substantially hydrophobic towards the liquid to be dispensed,

which tube is collapsed and sealed shut for a short distance at one end thereof and is open at its opposite end,

the wall of the tube being at its open end cleanly cut across at right angles to the major axis of the tube,

said open end part of the tube providing a dropper so sized in relation to the viscosity of the liquid to be dispensed that when the empty tube is squeezed shut intermediate its ends by compression between a thumb and a finger and the open end dipped into a body of the liquid to be dispensed and then the pressure released so as to create a sub-atmospheric pressure within the tube sufficient to draw into the tube slightly in excess of a single drop of the liquid to be dispensed, and, when the tube has then been withdrawn from the body of liquid and held vertically over a test area and the tube again is squeezed between thumb and finger one single drop of the liquid can be dispensed from the tube.

Claim 8 which depends from claim 9 requires that the article be made of polypropylene and have the dimensions set forth above in the description of the invention. Claim 5 depends from claim 8 and requires that the article's collapsed end be shaped so that it can function as a spreader for the dispensed drop.

Claim 10 is an independent claim which reads substantially the same as claim 9 but for the additional limitation that the collapsed end be shaped to function as a spreader.

The article which is primarily intended to be an aid in serological testing can be used, according to the specification, as follows:

In use, the dropper is compressed between thumb and forefinger of the technician, about one or two inches from its sealed end, and is squeezed shut while it is lowered (open end down) into a vertically held blood-collecting tube and the open end immersed in a pool of liquid (e. g., blood plasma) in the lower end of the liquid specimen in the blood-collecting tube. Then, release of pressure on the wall of the dropper creates a sub-atmospheric pressure within the dropper sufficient to draw into the dropper slightly in excess of a single drop of the liquid under test. The dropper is then withdrawn from the collecting

tube and is held vertically (open end down) over (but spaced from) a designated test area on a test card, and one drop of test liquid is expressed from the dropper onto such test area by suitably squeezing the control portion of the dropper. Thereupon, the technician turns the dropper about in his hand and, with the paddle-like sealed end of the article, he distributes the drop over the test area. Thereafter, the dropper-stirrer article is discarded.

According to appellant's specification, serological testing requiring an accurately dispensed drop was formerly carried out by the following process generally known to the prior art:

> For delivering a single drop of plasma or serum to the test area of a test card * * *, it heretofore had been conventional to use a glass capillary tube equipped with a rubber bulb for sucking liquid into the capillary. By skilled use of this device it was possible to draw up a small amount of plasma or serum from a blood collecting tube and to deliver a single drop of the liquid to a test spot, whereupon the liquid drop could be distributed over the area of the test spot by stirring it about with a conventional flat-ended toothpick. The rubber bulb could then be drawn off of the used capillary tube and used toothpick could be discarded.

### The Rejection

The board affirmed the rejection of the claims under 35 U.S.C. § 103 as obvious over Sands et al. (Sands) [2] in view of Wolman [3] and Gross.[4]

Sands discloses a dispensing device for introducing medicaments into body cavities. The following figure from the patent is illustrative of that device:

Fig. 1

[A7928]

2. U.S. 2,129,627 issued September 6, 1938.

3. U.S. 2,579,718 issued December 25, 1951.

4. U.S. 2,770,399 issued November 13, 1956.

In the figure, 1 is an elongated cylindrical tube which, according to the specification, can be made from "* * * any well known material such as paper of various types, rubber, 'Cellophane,' thin molded plastics, metal foil and the like." The specification also indicates that it is desirable that the material be moisture proof and be capable of yielding a fuzzy edge when torn.

The tube is closed by flattening at one end forming end portion 6, filled with a medicament 4 and then provided with a seal 7 of wax or other suitable material. A slide 3 is placed on the flattened end. In use, the sealed end of the tube is torn off, alone score line 8 if provided. The opened tube is inserted into the body cavity and the slide advanced to extrude the contents into the body.

Wolman discloses a bulb of compressible material having the capability of dispensing a predetermined volume of liquid. In its simplest form, the bulb is provided with means which limit the extent to which it can be compressed. Since the bulb is filled with enough fluid for several measured discharges, it is this limitation which determines the volume to be dispensed by the bulb.

Gross describes a fluid dispenser made up of a flexible bottle for a reservoir, a closure plug for the bottle and a tube extending through the plug into the bottle. The fluid is dispensed by squeezing the bottle which forces the fluid out through the tube. There is no provision which would adapt the dispenser to discharge a predetermined amount with accuracy.

Although the board affirmed a rejection under section 103, its opinion also indicates that the invention was considered as anticipated by the structure in Sands within the meaning of 35 U.S.C. § 102. The opinion states:

> *The structure of Sands et al. before the scoring at 8 and before the introduction of closure material 7 is the same as that recited in the claims on appeal.*

In claims 9 and 10 appellant attempts to define the size of his tube in terms of function and with respect to the viscosity of the dispensed liquid. The liquid is properly not set forth as a positive element of the claims. The viscosities of various liquids may differ greatly from each other. Recitation of the size of the open end part of the tube in relation to the viscosity of the not positively claimed liquid is at best a limitation of questionable definiteness. Cf. In re Law, 49 CCPA 1157, 303 F.2d 951, 782 O.G. 286, 1962 C.D. 395, 133 USPQ 653. Characteristics which are identifiable only in the use of the structure constitute no definite distinction of the structure *per se* over the reference. Claims 9 and 10 clearly are readable on tubes of various diameters within the scope of the disclosure of Sands et al. [Emphasis added.]

■■ We do not agree that the limitation in the claims expressed as a relationship between the size of the opening and the viscosity of the liquid to be dispensed is of "questionable definiteness." Assuming, as apparently did the board, that there is a relationship between the viscosity of any specific liquid to be dispensed and the size of the opening required if a single drop is to be dispensed, appellant's claims in our view are not indefinite in the sense that the scope of protection sought cannot be ascertained. In any event, the issue is not the definiteness of the limitation but whether the limitation is sufficient to distinguish the claimed structure from the reference. It was about the latter question that the outcome in *Law* actually revolved.

■■ In our view, the limitation in claims 9 and 10 does distinguish them from the Sands' structure. In this regard we do not disagree with the board's apparent conclusion that an intermediate structure made for the Sands' device could possess the characteristics called for in these claims. However, in view of the purpose for which the Sands' device is intended, it is apparent that it requires no critical dimension which would lead to a structure inherently hav-

ing those characteristics. Therefore, it would be mere happenstance if any structure made according to Sands met the limitations of the claims. An accidental or unwitting duplication of an invention cannot constitute an anticipation. Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279 (1880); Eibel Process Co. v. Minnesota and Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923). For this reason, we do not believe that Sands has "identically disclosed or described" the invention as required of an anticipatory reference applied under section 102. The disclosure as a whole cannot be considered to sufficiently direct one skilled in the art to the invention which is a single drop dispenser requiring critical dimensions.

The board's opinion is not devoid of reasoning that would support a rejection under section 103. It states:

> In our opinion, to one ordinarily skilled in the art the Sands et al. disclosure and well known plastic materials would suggest the structure, size, and material of appellant's claimed tube for use in the Sands et al. method of making their final product, namely a dispensing device. Where, as here, the substance of the claimed device is obvious for some significant purpose, it is immaterial as to patentability under 35 U.S.C. § 103 that appellant has disclosed another obvious or unobvious purpose. In re Mod, 56 CCPA 1041, 408 F.2d 1055, 161 USPQ 281 [other citations omitted].

■■ We do not agree that it would be obvious to make a structure having all the limitations of the claims on appeal merely because it can also be used as the intermediate structure called for by Sands. Certainly that intermediate does not demand the critical dimensions set forth in the claims. We have also concluded that the claims are not obvious over Sands in view of Wolman and Gross. The board did not feel that it was necessary to rely upon the latter two references to sustain the rejection. We agree that they add little to Sands

as none of the art of record is directed to single-drop dispensers and does not suggest the criterion that would be demanded of a tubular structure having that capability.

■ Appellant made of record below several affidavits alleging commercial success flowing from his invention. We think this evidence is of such a character that it convincingly supports the patentability of the claims over the prior art of record. However, the board treated this evidence in the following manner:

> We have considered all the affidavits filed under Rule 132 relating to commercial success. As to rejections under 35 U.S.C. § 103, such affidavits are significant only when close questions of obviousness exist. That is not the case here. Furthermore, there is no evidence that the success indicated by affidavits is attributable to the structure *per se* of the appealed claims rather than to appellant's not claimed method of using the structure.

Despite the board's comment on the significance of evidence of commercial success and its view of the "closeness" of the obviousness question in this case, it would appear that it did consider the affidavits on their merits but found no connection between the alleged success and the claimed invention. Recently we have set forth our view of the manner of evaluating evidence of commercial success relative to the question of whether an invention would have been obvious within the meaning of section 103. See In re Fielder, 471 F.2d 640 (CCPA 1973) and cases cited therein. It is not necessary for us to repeat that discussion here.

■■ Directing our attention now to the merits of the evidence of record here, we do not agree with the position implicitly held by the board to the effect that the evidence may be insufficient if the commercial success in question is attributable to the unclaimed method of use rather than the structure of the device itself. We think it would be fair to

say that the commercial success of any invention grows out of the fact that it is purchased to be used in some way.

A nexus between the merits of the invention and the evidence offered must be established before that evidence becomes relevant to the question of obviousness. In re Caveney, 386 F.2d 917, 55 CCPA 721 (1967). The important question is whether the invention's commercial success is related to advantages flowing from its use which were not available to the purchasing public before the invention was made. If the commercial success is unrelated to the merits of the invention, e. g., if demand is a product solely of advertising, then it cannot be persuasive of nonobviousness.

The evidence of commercial success offered in this case is for the most part embodied in three affidavits. These affidavits were executed by officials of the health departments of Maryland, Pennsylvania and Utah. The thrust of their averments is that their organizations have adopted the claimed device, marketed under the trademark "Dispenstir" as a part of a serological testing kit, in preference to the rubber bulb-capillary tube technique. The affidavits allege that the new device is more rapid (about twice as fast) and more accurate than the procedure they had been using. This meant that labor costs were significantly reduced.

Two other affidavits were executed by an employee of the distributor of Dispenstirs. These affidavits indicate that the health departments of New York City and the State of Colorado, the Provincial Laboratory in Edmonton, Alberta and two Army hospitals have also switched to Dispenstirs. The affidavits also indicate that there is significant demand for Dispenstirs sold separately from the kits. In them it is also alleged that more than 11,000,000 Dispenstirs were sold between September 1, 1969 and October 19, 1970, most as part of a serological kit, and that sales for that period exceeded $490,000. We are convinced that appellant has demonstrated

that the success achieved by his invention has grown out of the advantages flowing from its use as recognized by those skilled in the art and is, therefore, relevant to the question of obviousness.

We conclude that the invention would not have been obvious in view of the art of record which, as we have already indicated, is not directed to single-drop dispensers, especially in view of the evidence of commercial success. Accordingly, the board's decision is reversed.

Reversed.