SOLDER REMOVAL COMPANY and
Jesse C. Hood, Appellants,

v.

UNITED STATES INTERNATIONAL
TRADE COMMISSION, Dipl. Ing. Er-
nest Spirig, and Signalarm, Inc., Appel-
lees.

Patent Appeal No. 77–25.

United States Court of Customs
and Patent Appeals.

Aug. 24, 1978.

Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst, B. G. Nilsson, Robert Berliner, Los Angeles, Cal., attys. of record, for appellants.

Robert M. M. Seto, Michael H. Stein and Jeffrey M. Lang, for United States International Trade Commission.

George M. Sirilla, Peter W. Gowdey, Robert W. Adams, Cushman, Darby & Cushman, Washington, D.C., for Dipl. Ing. Ernest Spirig and Signalarm, Inc.

Before MARKEY, Chief Judge, RICH, BALDWIN, LANE and MILLER, Judges.

MARKEY, Chief Judge.

Appeal from a July 1, 1977, order of the United States International Trade Commission (Commission), terminating investigation No. 337–TA–26, *In re Certain Solder Removal Wicks*, in view of its determination that no violation of section 337 of the Tariff Act of 1930, as amended by the Trade Act of 1974, 19 U.S.C. § 1337,[1] exists

---

1. Section 337 provides in pertinent part:

    (a)  Unfair methods of competition declared unlawful.

    Unfair methods of competition and unfair acts in the importation of articles into the United States, or in their sale by the owner, importer, consignee, or agent of either, the effect or tendency of which is to destroy or substantially injure an industry, efficiently and economically operated, in the United

in the importation into, or sale in, the United States of certain solder removal wicks. This is the first appeal under 19 U.S.C. § 1337(c) in which the issue of patent validity is reached.[2] We affirm.

### Background

On May 10, 1976, appellants, Jesse C. Hood (Hood) and Solder Removal Company (SRC), filed a complaint with the Commission under § 337, alleging that the importation into and sale in this country of certain solder removal wicks constituted an unfair act or unfair method of competition. The wicks were made in Switzerland by appellee Dipl. Ing. Ernest Spirig (Spirig) and imported for sale by appellee Signalarm, Inc. (Signalarm). SRC and Hood alleged that the wicks infringed one or both of the claims of U.S. Patent No. 3,627,191 to Hood (Hood patent),[3] which read:

1. Copper strands elongatedly braided in the form of a consumable wick for drawing up molten solder by capillary action, said wick having an exterior capillary surface of copper, each strand having substantially along its entire length its exposed surface directly in contact and substantially entirely coated with a noncorrosive solder flux applied from a volatile solvent solution of 25 weight percent or less of said flux.

2. The invention according to claim 1 wherein said solder flux is a pine rosin, a rosin obtained from tall oil by removal of fatty acid components, a methyl ester of abietic acid, or a methyl ester of pimaric acid.

An evidentiary hearing was conducted by a Commission Administrative Law Judge (ALJ)[4] who issued extensive findings of

States, or to prevent the establishment of such an industry, or to restrain or monopolize trade and commerce in the United States, are declared unlawful, and when found by the Commission to exist shall be dealt with, in addition to any other provisions of law, as provided in this section.

   *     *     *     *     *     *

(c) Determinations; reviews

The Commission shall determine, with respect to each investigation conducted by it under this section, whether or not there is a violation of this section. Each determination under subsection (d) or (e) of this section shall be made on the record after notice and opportunity for a hearing in conformity with the provisions of subchapter II of chapter 5 of Title 5. All legal and equitable defenses may be presented in all cases. Any person adversely affected by a final determination of the Commission under subsection (d) or (e) of this section may appeal such determination to the United States Court of Customs and Patent Appeals. Such court shall have jurisdiction to review such determination in the same manner and subject to the same limitations and conditions as in the case of appeals from decisions of the United States Customs Court.

(d) Exclusion of articles from entry.

If the Commission determines, as a result of an investigation under this section, that there is violation of this section, it shall direct that the articles concerned, imported by any person violating the provision of this section, be excluded from entry into the United States, unless, after considering the effect of such exclusion upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, it finds that such articles should not be excluded from entry. The Commission shall notify the Secretary of the Treasury of its action under this subsection directing such exclusion from entry, and upon receipt of such notice, the Secretary shall, through the proper officers refuse such entry.

2. In *Coleco Indus., Inc. v. USITC,* 573 F.2d 1247, 65 CCPA ——, 197 USPQ 472 (1978), the only other case under § 337 in which this court has reached the merits, the dispositive issue was infringement. Patent validity was not an issue before the court in *Coleco.* 573 F.2d at 1252 n. 5, 65 CCPA at ——, 197 USPQ at 476 n. 5.

3. As other unfair acts and unfair competition under § 337, SRC and Hood alleged in their complaint that the imported wicks were "passed off" as the product of SRC, were falsely labeled as having a registered trademark, and were falsely advertised with the words "patent applied for" and "Patent Pending." During the Commission investigative proceedings, appellants withdrew all those allegations. Though the ALJ's recommended determination and the Commission's Memorandum Opinion dealt with the issues raised by those allegations, appellants do not pursue them on appeal, and they are not before us.

4. The Commission's Opinion refers to the person who conducted the hearing as the "presiding officer." The Commission's brief employs the title "Administrative Law Judge." Appel-

fact and conclusions of law touching upon all allegations brought before the Commission. Respecting the patent, the ALJ's recommended determination was that:

[T]here is no violation of Section 337 of the Tariff Act of 1930 in the importation into the United States, and the sale, of certain solder removal wicks, by reason of the fact that claims 1 and 2 of United States Letters Patent No. 3,627,191 are invalid, for purposes of Section 337, as obvious in view of their prior art, under 35 U.S.C. § 103, and that there is no effect or tendency to destroy of [sic] substantially injure an industry, efficiently and economically operated, in the United States * * *. [footnote omitted]

The most pertinent prior art was determined by the ALJ to be:

(1) The Beattie-Ampex practice, used publicly to produce copper braid desoldering wicks at Ampex Corporation from 1966 to at least 1972, and the wicks so produced;

(2) *Solder,* a 1965 booklet for the Kester Solder Company; and

(3) *Soldering Manual,* a 1959 publication of the American Welding Society.

The ALJ concluded that there was "no presumption" of validity applicable to the Hood patent, because the Beattie-Ampex practice and *Solder* were neither presented to nor considered by the Patent and Trademark Office (PTO).

In analyzing the differences between the prior art and the Hood claims, the ALJ found all limitations of claims 1 and 2 fully met by wicks produced in the Beattie-Ampex practice, except for that defining the solvent solution as "of 25 weight percent or less of said flux."[5] Regarding that limitation, the ALJ found the indication in *Soldering Manual* that it was known to use, on clean copper, flux solutions in the range of 10–25 weight percent of rosin mixed with volatile solvent, and further found from *Solder* and other evidence that, in 1967 and prior thereto, Kester Solder Company was offering several rosin flux formulations with a rosin concentration of 20–50 weight percent.

On that record, the ALJ concluded that one skilled in the art in 1966 would have used a rosin flux solution having the flux concentration of claims 1 and 2.

The Commission's Memorandum Opinion, issued July 1, 1977, was unanimous in determining that there was no violation of § 337. The Commission majority based its determination on the fact that the claims of the Hood patent were invalid, in view of the prior art, under 35 U.S.C. § 103, noting, "We further adopt by reference the findings of fact and conclusions of law of the presiding officer insofar as they are supportive of and not inconsistent with the above determination."

## Issue

The dispositive issue is whether the subject matter as a whole of claims 1 and 2 of the Hood patent would have been obvious to one of ordinary skill in the art of solder and fluxes useable in the electronics industry at the time the invention was made.[6]

---

lants' brief employs "presiding officer." Spirig and Signalarm employ the title "Judge." In 1946, Congress provided that "there shall be appointed by and for each agency as many qualified and competent examiners as may be necessary * * *." Administrative Procedure Act, ch. 324, § 11, 60 Stat. 244 (1946). The title "hearing examiners" appeared in the 1966 statute which codified Title 5 of the U.S. Code. Act of Sept. 6, 1966, Pub. L. No. 89–554, 80 Stat. 415 (codifying 5 U.S.C. § 3105). In 1972, the Civil Service Commission changed the title to "Administrative Law Judge." 37 Fed.Reg. 16,787 (1972). In 1978, Congress changed the statutory title from "hearing examiner" to "administrative law judge." Act of

March 27, 1978, Pub. L. No. 95–251, 92 Stat. 183. There are now over one thousand civil service employees bearing the title.

5. The flux concentration of the solvent solution used in the Beattie-Ampex practice could not be recalled by witness Beattie and was not disclosed.

6. Chairman Minchew and Commissioners Moore and Ablondi constituted the majority. Its determination that there was no violation of § 337 resulting from the alleged infringement of the Hood patent, was based solely on the invalidity of the Hood patent. Vice Chairman Parker and Commissioner Bedell were of the view

## OPINION

### (1) Standard of Review

■ The Commission erroneously suggests that the appropriate standard of review of Commission determinations under § 337 is the "substantial evidence" standard established in the Administrative Procedure Act, 5 U.S.C. § 706(2)(E). The appropriate standard is explicitly stated in § 337(c), *supra* note 1, to be "in the same manner and subject to the same limitations and conditions as in the case of appeals from decisions of the United States Customs Court," As was stated in *Montgomery Ward & Co. v. United States,* 499 F.2d 1283, 1285, 61 CCPA 101, 103, C.A.D. 1131 (1974), concerning review under 28 U.S.C. §§ 1541, 2601, "We do not agree with [the] suggestion that we are bound to accept the Customs Court's findings of fact *whenever* there is substantial supporting evidence, and we will not do so when they are clearly contrary to the weight of the evidence." *Accord, Pollard Bearings Corp. v. United States,* 511 F.2d 568, 571, 62 CCPA 61, 64, C.A.D. 1146 (1975); *Northam Warren Corp. v. United States,* 475 F.2d 647, 649, 60 CCPA 117, 119, C.A.D. 1092 (1973); *Commonwealth Oil Refining Co. v. United States,* 480 F.2d 1352, 1355, 60 CCPA 162, 166, C.A.D. 1105 (1973).

The "substantial evidence" standard is particularly inapplicable to judicial review of patent validity issues under § 337. Some prior art is citable against virtually every issued patent. With what, in most cases, would constitute "substantial evidence" thus present, effective judicial review of Commission invalidity holdings would be nullified if the standard were that of 5 U.S.C. § 706(2)(E).

### (2) The Presumption of Validity

■ The ALJ's conclusion, that the statutory presumption of validity, 35 U.S.C. § 282,[7] does not exist when the most pertinent prior art was neither presented to nor considered by the PTO, is unsound. Rebuttal of the presumption may be more easily and more often achieved in reliance on prior art more pertinent than that considered by the examiner; but whether rebuttal is achieved requires careful consideration of whether the prior art relied upon does in truth render the claimed invention anticipated or obvious. Until that question is answered in the affirmative, the presumption is not rebutted and continues alive and well.

■ The first sentence of § 282, that "[a] patent shall be presumed valid," must be read in the context of the remainder of the first paragraph of § 282, which provides that the party asserting invalidity bears the burden of establishing it. Section 282 thus mandates not only a presumption shifting the burden of going forward in a purely procedural sense, but also places the burden of persuasion on the party who asserts that the patent is invalid.[8] To speak of the

that appellants had failed to establish sufficient business injury to constitute an effect or tendency to destroy or substantially injure an industry, efficiently and economically operated in the United States and that it was, therefore, not necessary to reach the issues of infringement or validity of the Hood patent. Because we affirm the majority's invalidity holding, we do not reach the question of whether appellants' showing of business injury was insufficient even if the Hood patent were valid and infringed.

Commissioner Moore concluded that the claims of the Hood patent, if valid, would be infringed. There was no Commission determination on that question, and it is not before us.

Had it been necessary to reverse the Commission's invalidity holding, a remand would have been required for consideration by the Commission of the issues of infringement and whether business injury was insufficient notwithstanding the determination of validity and infringement.

**7.** Section 282 provides in part:

A patent shall be presumed valid. Each claim of a patent (whether in independent or dependent form) shall be presumed valid independently of the validity of other claims; dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it.

**8.** Some commentators on evidence say a presumption only shifts the burden of going forward; others say it also shifts the burden of persuasion. 1 Weinstein's Evidence ¶ 300[01] (1977). Federal Rule of Evidence 301 reflects the former view:

presumption as "no longer attaching" is to risk a concomitant, and unspoken, assumption that the burden of persuasion is thereafter no longer upon him who asserts invalidity. That view is contrary to the meaning of § 282, for the burden of persuasion is and remains always upon the party asserting invalidity, whether the most pertinent prior art was or was not considered by the examiner.[9]

■ We are not unaware of language in some court opinions indicating that *no* presumption exists when prior art not considered by the PTO is cited to the court. *See, e. g., Globe Linings, Inc. v. City of Corvallis, supra* note 9, 555 F.2d at 729, 194 USPQ at 417; *Eisele v. St. Amour,* 423 F.2d 135, 138–39, 165 USPQ 161, 164 (CA6 1970); *Everest & Jennings, Inc. v. Colson Corp.,* 371 F.2d 240, 242, 152 USPQ 209, 210 (CA7), *cert. denied,* 387 U.S. 918, 87 S.Ct. 2032, 18 L.Ed.2d 971, 153 USPQ 888 (1967). The better view, however, for the reasons stated above, is that the presumption of validity is

never "destroyed" in the sense that the burden of persuasion is no longer upon the party asserting invalidity.

The statute does not make the presumption applicable in some situations and not in others. The distinction is judge-made between situations in which the most pertinent prior art was considered by the PTO, and those in which it was not. It is not surprising, therefore, that courts faced with the latter situation have envisaged a spectrum of effects on the presumption, some describing it "weakened," or "undercut," and others viewing it as having been "dissipated," or "destroyed." [10]

■ Though the presumption of validity remains in existence until rebutted and the burden of persuasion continues throughout the litigation on him who asserts invalidity, the burden of persuasion may be more easily carried by evidence consisting of more pertinent prior art than that considered by the examiner. So here, the Beattie-Ampex

Rule 301. Presumptions in General Civil Actions and Proceedings
  In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast.
  In ascertaining the complete nature and effect of the statutory presumption of patent validity, however, 35 U.S.C. § 282 must be given precedence over the Federal Rules of Evidence. That section requires that a party asserting invalidity bear not only the presumption-generated burden of going forward with proof but also the burden of persuasion on that issue. *See* Pat. L. Persp. § A1[2] (1976 Dev.). To hold otherwise would involve total disregard of the last sentence of the first paragraph of § 282.

9. It has been pointed out that a mere failure to cite certain prior art does not necessarily mean it was not considered by the examiner, who may have considered it unworthy of citation. Similarly, the presumption has been held unaffected by prior art no more pertinent than that cited by the examiner. *See, e. g., Globe Linings, Inc. v. City of Corvallis,* 555 F.2d 727, 730, 194 USPQ 415, 418 (CA9), *cert. denied,* 434 U.S. 985, 98 S.Ct. 611, 54 L.Ed.2d 479, 196

USPQ 208 (1977); *Saf-Gard Products, Inc. v. Service Parts, Inc.,* 532 F.2d 1266, 1271, 190 USPQ 455, 458–59 (CA9), *cert. denied,* 429 U.S. 896, 97 S.Ct. 258, 50 L.Ed.2d 179, 191 USPQ 764 (1976); *Schnadig v. Gaines Mfg. Co.,* 494 F.2d 383, 391, 181 USPQ 417, 422–23 (CA6 1974).

10. Application of § 282 in its entirety has suffered from analogy of the presumption itself to the deference due administrative agencies. "This presumption is based upon (a) the acknowledged experience and expertise of the Patent Office personnel, and (b) recognition that patent approval is a species of administrative determination supported by evidence." *Parker v. Motorola, Inc.,* 524 F.2d 518, 521, 188 USPQ 225, 227 (CA5 1975), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2175, 48 L.Ed.2d 799, 190 USPQ 172 (1976). *Accord, Chicago Rawhide Mfg., Co. v. Crane Packing Co.,* 523 F.2d 452, 458, 187 USPQ 540, 548 (CA7 1975), *cert. denied,* 423 U.S. 1091, 96 S.Ct. 887, 47 L.Ed.2d 103, 188 USPQ 480 (1976); *Neff Instrument Corp. v. Cohu Electronics, Inc.,* 298 F.2d 82, 86, 132 USPQ 98, 101 (CA9 1961). The presumption of validity was the law prior to the 1952 Act, *see* Federico, *Commentary on the New Patent Act,* 35 U.S.C.A. p. 1, at 54–55 (1954). The rationale of assumed administrative correctness finds its genesis in *Morgan v. Daniels,* 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657 (1894).

practice and the *Solder* booklet were not on this record considered by the examiner and were more pertinent than that considered.[11]

In the Beattie-Ampex practice, a 10, 20, or 30–foot length of clean flattened copper braid was wrapped around an object, such as a stick, and the entire unit was dipped into a rosin flux solution. Thereafter the unit was removed from the solution and dried with a hot-air gun. The ALJ correctly determined that the Beattie-Ampex practice met all the limitations of claims 1 and 2, except the limitations respecting the flux solution "of 25 weight percent or less of said flux."

The references cited by the examiner did not disclose each strand of the wick coated with solder flux "substantially along its entire length." The ALJ found that wicks produced in the Beattie-Ampex practice met that limitation, and that finding is not unreasonable in the light of the evidence of record.[12] In all events, appellants do not dispute the finding that the Beattie-Ampex wicks were coated along their "entire length." Appellants do say that coating was not "noncorrosive."

---

**11.** During prosecution of the Hood patent the examiner cited many references. With respect to all the limitations of the claims of the Hood patent, the most pertinent among those cited references were Prohofsky U.S. Patent No. 3,371,249, Baker U.S. Patent No. 1,484,202, and the *Soldering Manual.* Prohofsky was cited for its disclosure of stranded copper solder wick used to draw up solder by capillary action, and Baker for its teaching of applying flux to an intertwisted metal strand. *Soldering Manual* was cited for its disclosure of a flux solution with 25 weight percent rosin.

**12.** Supporting this finding was a test of a 10–year old wick specimen produced in accordance with the Beattie-Ampex practice. With the specimen taken from the bottom of a wick spool, the portion closest to the stick during the rosin coating step, and thus the portion least likely to be coated, was shown by the accepted Lieberman-Storch test to have rosin present thereon. The presence of rosin on the least likely portion reasonably supports the finding that the remaining length of the wick was coated.

No single reference before the examiner having disclosed all the limitations of claims 1 and 2, save the concentration of the flux solution, the Beattie-Ampex practice was not merely

---

### (3) *Obviousness*

Though the burden of persuasion on the issue of invalidity was and remained continuously upon Signalarm and Spirig, the present evidence of record, considered as a whole, was sufficient to carry that burden and to rebut the presumption of validity.

We agree with the Commission's determination that it would have been obvious, to one of ordinary skill in the solder and flux art in the electronics industry about 1966–67, to employ a volatile solvent solution of 25 weight percent or less of a noncorrosive solder flux in the Beattie-Ampex practice.[13]

The ALJ followed the guidelines for determining obviousness set forth in *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966):

Under § 103 the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

---

cumulative with the prior art cited by the examiner. The *Solder* reference, not considered by the examiner, is in one sense cumulative with the cited *Soldering Manual* reference, in its disclosure of rosin flux formulations "of 25 weight percent or less of said flux." *Solder* is in another sense noncumulative, in its disclosure of a reason or motivation for using low concentration flux solutions, *i. e.,* to reduce rosin residue.

**13.** In the hearings conducted by the ALJ, Spirig and Signalarm alleged unenforceability and invalidity of the Hood patent because of insertion of new matter, late claiming, failure to file a supplemental oath, and failure to fully disclose prior art. The ALJ concluded that the Hood patent was not unenforceable for any of these reasons. Before us, counsel for the Commission and for Spirig and Signalarm have asserted unenforceability of the Hood patent, apparently based upon breach of the duty of disclosure before the PTO. Because the only patent issue on which the Commission majority based its no-violation conclusion was the invalidity of the Hood patent under 35 U.S.C. § 103, only that patent issue is before us, and we express no view on any other.

The ALJ found the suggestion of employing, in the Beattie-Ampex practice, a volatile solvent solution of 25 weight percent or less of a noncorrosive solder flux, in the circumstance that it was well known in 1966:

> (1) that flux solutions in the 5 to 10 weight percent [range] of rosin flux were used as protective coating for printed circuit boards; (2) that various booklets in the soldering field discussed in detail the desirability of using low viscosity flux solutions where it was desirable that flux residue be a minimum [e. g., *Solder*]; (3) that high viscosity flux solutions were diluted by thinners to minimize flux residue; and (4) that such flux solutions operated satisfactorily for their intended purpose * * *. Finally, the Protecto Coating [25 weight percent rosin] was available at least from 1965 * * *.

The quoted factors support the conclusion, at least prima facie, that one skilled in the art and having the prior art of record before him, would have found it obvious to employ rosin flux solutions of 25 or less weight percent rosin in the Beattie-Ampex practice.

Appellants say, first, that any suggestion of employing low concentration flux solutions is defeated by military specifications, issued prior to April 1972 and calling for rosin flux solutions of at least 35 weight percent solids. That argument is defeated by the non-subjection of a very large segment of the electronics industry to military specifications, and by the *Soldering Manual* prior art disclosure that "[f]or all electronic and critical soldering applications, water white rosin dissolved in an organic solvent [10–25 percent by weight rosin] is the safest known flux." [14]

Next, appellants say the claimed invention of the Hood patent solves a green-corrosion problem not recognized prior to Hood's invention, arguing that copper braids coated with rosin flux solutions containing greater than 25 weight percent rosin evince green-corrosion on the braids, and copper braids coated with a solution having rosin flux solutions less than 25% weight percent rosin do not. Respecting this argument, the ALJ concluded:

> Complainants argue that prior experimentation with different concentrations of flux solutions was directed to the problem of residue, and not greening. Indeed, no party argues otherwise. However, it is the *practice* of varying the rosin flux solution concentration which the [ALJ] finds to have been obvious at the time of the alleged invention, and not a complete understanding of the problem of greening itself (which *today* is explained by the "skinning" theory).

■■■ The ALJ appears to have viewed arguments that an invention solved a problem not previously recognized, and that nonobviousness may be evidenced by discovery of a problem source, as irrelevant. That view would be incorrect. *In re Sponnoble,* 405 F.2d 578, 585, 56 CCPA 823, 832–33, 160 USPQ 237, 243 (1969); *In re Linnert,* 309 F.2d 498, 502, 50 CCPA 753, 758, 135 USPQ 307, 310 (1962); *In re Antonson,* 272 F.2d 948, 949, 47 CCPA 740, 741–42, 124 USPQ 132, 133 (1959). The ALJ appears also to have felt that where a practice is suggested by the prior art to solve one problem, a conclusion of nonobviousness cannot be supported on the ground that it also solves another problem, previously recognized or not. That position would be too broad. Where the reason for the practice suggested by the prior art is much less significant than the reason derived from the inventor's solution to another problem, the results may be so unexpected as to support a conclusion of nonobviousness. *Cf. In re Lintner,* 458 F.2d 1013, 59 CCPA 1004, 173 USPQ 560 (1972). The

---

14. The ALJ found the pertinent art to be "that of solder and fluxes as applied to the electronics industry." Appellants have not challenged that finding. Whether solder is being applied or removed, fluxes serve the same cleansing and wetting functions, as set forth in a number of the references cited by the examiner during prosecution of the Hood patent. The ALJ found that solder removal by wicking involved a soldering action on the wick, based on Hood's testimony so stating.

latter, as we shall see, is not true in the present case.

As an element in the determination of the obviousness-nonobviousness issue, the significance of the inventor's having discovered the source of a problem had its genesis in *Eibel Process Co. v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923), where the discovery of the source of the long-standing paper-rippling problem in paper-making machines operated at high speeds was deemed highly significant, particularly in light of the pervasive adoption of the invention by the entire industry. Unlike the situation in *Eibel,* there is here no evidence that the specific green-corrosion problem with copper braid wicks relied upon by appellants was long known and, indeed, the evidence of its very existence is at best equivocal.

In this source-of-the-problem context, the present record refers to two problems: (1) since at least 1960, it has been recognized that rosin coated copper may turn green under certain conditions, a problem solved, said appellees' expert Bernier, by instructions to customers, *e. g.*, use of a particular flux solution activator, and (2) unrecognized prior to Hood's invention, say appellants, was the problem of green-corrosion of copper braids, solved, appellants now say, by rosin flux solutions having less than 25 weight percent rosin. In support of their source-of-the-problem argument, appellants rely on *In re Nomiya,* 509 F.2d 566, 572, 184 USPQ 607, 612–13 (Cust. & Pat.App.1975), where the absence of evidence that one of ordinary skill in the art would even have expected the problem to exist was weighted on the side of nonobviousness. That argument founders, however, on the failure of the present record to establish the existence of any green-corrosion problem with copper braids solved by the present invention.

Appellees take the position that no significant corrosion problem has ever existed for prior art wicks like those produced in the Beattie-Ampex practice and that, if it does exist, it is not significantly related to flux concentration in the solution.

Appellees' position is supported by: (1) though the Hood patent specification discloses the claimed wicks as being free from a tendency to readily corrode, that property is not attributed in the specification to the rosin concentration in the solution; (2) appellees' witness Dr. Foresti conducted tests described as establishing that copper braids produced in the Beattie-Ampex practice did not tend to corrode, regardless of the concentration of rosin in the flux solution, which in the tests varied from 10 to 50 weight percent; (3) appellees' expert Bernier confirmed the testing methods of Foresti and agreed that rosin concentration in the flux solution makes no difference in tendency of the copper braid to turn green; [15] (4) appellants' own expert, Dr. Atkins, testified that the prime cause of corrosion was incomplete removal of the flux solution solvent.[16]

The ALJ found that appellants offered no test results comparable to those of Dr. Foresti, and effective to establish a corrosion tendency in Beattie-Ampex solder wicks. To discredit Dr. Foresti's tests, appellants relied upon a portion of Dr. Atkins' testimony which the ALJ found unpersuasive. A demonstration at the hearing, in which appellants' witness Berkeble dipped a bare copper braid into a highly concentrated rosin solution, was equally unpersuasive.[17] The flux coating was not dried in

15. On cross-examination Bernier gave testimony contrary to that given on direct. The ALJ, having the benefit of opportunity to observe the witness, chose to believe that given on direct, finding it confirmative of Foresti's tests. Removed as we are from the scene at the hearing, we are not prepared to say that Bernier's testimony on cross-examination was such as to totally destroy his credibility.

16. Similarly, we cannot say that the ALJ was precluded from accepting this testimony by At-

kins' other testimony indicating that discoloration is likely to occur if the rosin concentration is above 25 percent, "dependent upon environmental conditions."

17. An SRC employee, who had performed tests in preparation for the hearing, quit his job just prior to hearing, apparently necessitating the quick substitution of Mr. Berkeble's demonstration.

accordance with the Beattie-Ampex practice but was permitted to dry slowly at ambient conditions. Though green coloration was detectable on the demonstration braid, after three days, with a 30-power microscope but not with the naked eye,[18] the demonstration did not render unjustified the ALJ's finding that appellants introduced no test results establishing the existence of and significance in a green-corrosion problem in the Beattie-Ampex solder wicks.

The ALJ made a finding, based upon Dr. Atkins' answer to a hypothetical question, that a copper braid immersed in a 35 percent rosin solution has a greater tendency toward greening upon subsequent drying than one immersed in a 25 percent solution. That finding, however, relates only to the degree of greening and does not support the argument that appellants' invention solved the problem outlined by appellants. To the extent that that finding be viewed as supportive of appellants' position, it would be inconsistent with other findings, including, *inter alia,* the ALJ's finding that samples of copper braid with flux solutions ranging from 10 to 50 weight percent rosin concentration exhibited no greening whatever.

Appellants point to U.S. Patent No. 3,715,797 to Jackson, Weltsch, and Beattie as evidence that their problem existed and that a different solution was attempted. The patent is devoted to the wicking method of solder removal. The sole reference in that patent to corrosion is the statement that the braid is "coated with a corrosion resistant material 18, such as for example, tin." The use of a corrosion resistant material appears only in dependent claim 2. Whatever implications may be drawn from the words "corrosion resistant" in U.S. Patent No. 3,715,797 respecting the existence of a problem, and whatever weight those implications may be given in the light of evidence that the problem does not exist, those implications cannot establish that ap-

pellants' use of 25 percent or less rosin flux solved a corrosion problem. Attempted solutions of others become material only *after* it has been established that the invention under consideration has solved a problem.

■■■ Appellants have sought to rely upon commercial success, citing the ALJ's finding that SRC has had 90 percent of the solder removal wick market. The record, however, does not show a commercial success causally related to the features of the claimed invention. A nexus must be established between the merits of the claimed invention and evidence of commercial success before that evidence may become relevant to the issue of obviousness. *In re Thompson,* 545 F.2d 1290, 1295, 192 USPQ 275, 277 (Cust. & Pat.App.1976); *In re Felton,* 484 F.2d 495, 501, 179 USPQ 295, 299 (Cust. & Pat.App.1973); *In re Caveney,* 386 F.2d 917, 923, 55 CCPA 721, 728, 155 USPQ 681, 687 (1967). Commercial success due only to superior business acumen, or effective advertising, is of no relevance to a determination of whether the invention would have been obvious under 35 U.S.C. § 103. Appellants having failed to establish the required nexus between SRC's market dominance and the features of the invention claimed in the Hood patent, the commercial success indicia of nonobviousness is absent from the present record.

Though the record contains conflicting evidence, and some of the ALJ's findings are internally inconsistent, we cannot say that the refusal to accept appellants' assertion of unexpected results in the solution of a green-corrosion problem was contrary to the weight of the evidence, or that the Commission was unwarranted in adopting those findings of the ALJ which were supportive of and not inconsistent with its "no-violation" determination based on invalidity of the Hood patent.

---

18. There was disagreement on whether proof of a corrosion problem required observation of green corrosion with the naked eye. The significance of the disagreement is diminished by that which diminishes the significance of the demonstration itself, *i. e.,* that the demonstration was not in accord with the Beattie-Ampex practice. The tests of Dr. Foresti provided data acquired through observation by the naked eye and by microscope.

638

*Conclusion*

We affirm the Commission's determination that there is no violation of Section 337, because the subject matter as a whole of the claims of the Hood patent would have been obvious to one of ordinary skill in the art at the time the invention was made, and the claims are thus invalid under 35 U.S.C. § 103.

BALDWIN, J., concurs in the result.