Sam PROLER, an individual, Plaintiff,

v.

MODERN EQUIPMENT COMPANY, a corporation, Defendant.

Civ. A. No. 77–C–268.

United States District Court,
E.D. Wisconsin.

Feb. 26, 1985.

Guy E. Matthews, Houston, Tex., for plaintiff.

Thomas W. Godfrey, Godfrey, Trump & Hayes, Joseph A. Gemignani, Michael, Best & Friedrich, Milwaukee, Wis., for defendant.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

Before me are the motions of defendant Modern Equipment Company for judgment notwithstanding the verdict or, alternatively, for a new trial. Though not easy to describe in a phrase or two, this case, which was tried for 18 days starting October 30, 1984, involved claims relating to a patent and a confidentiality agreement. The jury returned a stunning verdict on November 27, 1984, awarding plaintiff Sam Proler $75,000,001.00. Before turning to the specific motions before me, I will briefly recall the winding path the case has followed.

It was filed in 1977 and assigned to Judge Robert W. Warren. It was transferred to me when I joined this court in January of 1980. Trial was first set for September 3, 1980, and then reset for October 14, 1980. Due to conflicts with the criminal calendar and because of at least two requests of the plaintiff, it was rescheduled for March 10, 1981, May 19, 1981, January 18, 1982, and October 31, 1983. It was finally tried in the fall of 1984. The difficulty in finding a trial date was intensified by the estimated length of the trial, which at one time was three months, and by a personal injury sustained by one of the lead attorneys.

As is often the case, the delays did nothing to solidify or focus the issues. If anything, the case became more and more amorphous. A fourth amended complaint, filed in August, 1980, contained 77 numbered paragraphs spread over 29 pages. The prayer was for over $100,000,000.00 in damages. Defendant's answer and counterclaim was 28 pages long, with 92 numbered paragraphs. At the beginning of the trial, Proler dismissed many of his claims, and certain defendants were dismissed by stipulation. However, the case remained unfocused. After several days of trial, the parties submitted their proposed verdict forms and jury instructions. Plaintiff's proposed verdict contained 29 questions for the jury, many of them overlapping with one another. The defendant proposed as a jury instruction that I read the pleadings, which, even allowing for the dismissed claims, would have taken longer than the time it takes to watch "60 Minutes."

The case simply should not have been as big and certainly not as complicated as the parties made it. The verdict form which was ultimately submitted to the jury contained three questions requiring seven answers. Although such drastic simplification of the verdict form might in the usual course of events have provoked vigorous objection, plaintiff had no objection to the court's jury instructions or the verdict forms. The defendant had only minor objections and a few changes were made to meet them. Accordingly, with one objection to a portion of a jury instruction (it will be discussed below), the parties agreed to the verdict form and the charge.

Although my remarks thus far are critical, perhaps plaintiff cannot be faulted for his lack of focus. It may very well be that a deliberate lack of focus was what made the case look big to the jury. It is clear that something made the jurors conclude that $75,000,000.00 was an appropriate award.

What was undisputed in this case was that for about thirty years prior to 1970

and the events of this lawsuit, Sam Proler was a scrap metal dealer. In late 1969, he began to work on developing a process for using hot molten metal baths to make more metal by inserting a metallic compound or oxide or metal in the bath. Before filing an application for the patent involved in this case he had filed other applications for patents involving the processing of metal, metallic ores and/or compounds.

Prior to 1970, Modern Equipment Company was in the business of manufacturing and selling equipment to foundries. It entered into a relationship with a West German company, AEG Elotherm, and began to market one of AEG's products, an eldomet, which is a linear induction elevator capable of moving molten metal uphill.

Proler saw an advertisement for the eldomet and wrote to Modern expressing interest in the machine. Henry Eickelberg, then Modern's Vice-President for Research, wrote to Proler. The relationship between Proler and officials of Modern resulted in several confidentiality and sales agreements: the first on April 6, 1971, another on April 18, 1972, and an exclusive sales agreement effective July 1, 1973.

Several patent applications were also filed by the parties. On September 1, 1972, Modern filed a United States patent application for a "method for melting magnetically attractive small metal particles." Eickelberg was listed as the inventor. The patent application was eventually abandoned. However, during 1973, Modern filed for several foreign patents on the invention. The foreign applications benefited from the September 1972 United States filing date.

On November 14, 1972, Proler filed a United States patent application relating to "a method for enhancing reduction of ores, oxides and melting of metals by magnetic forces." The Proler patent eventually was issued as U.S. Patent No. 3,881,915. The parties agree that Modern's application and the Proler patent describe the same invention. Part of Proler's claim was that there was a "cloud" on his patent because of the existence of Modern's foreign patents.

Throughout the trial, counsel for Proler described the case rather aptly as a "whodunit." The questions submitted to the jury centered on "whodunit" and what did they do. The first asked as between Proler and Eickelberg, who invented the process? The second question involved whether the Proler patent was invalid. The third question asked whether Modern broke a confidentiality agreement with Proler by misappropriating his protected idea and if it did, whether compensatory and/or punitive damages should be awarded. The jury found that Proler was the inventor, that his patent was not invalid, that Modern had breached the confidentiality agreement, and that compensatory damages in the amount of $75,000,000.00 and punitive damages in the amount of $1.00 should be awarded to Proler.

Obviously the first thing that strikes one about the verdict is its size. $75,000,000.00 is a mind-boggling figure. At today's prime rate, it earns interest of $1,027.00 every hour. Just recently it was announced that the Milwaukee Bucks, this city's NBA franchise, was up for sale. The sale price is generally expected to be somewhere in the neighborhood of $15 to $20 million. With the kind of money the jury awarded in this case, Mr. Proler could not only buy the Bucks, but he could probably also get the Detroit Pistons, Chicago Bulls and Atlanta Hawks, and thus own more than half the teams in the Central Division of the NBA.

The second thing that sticks out in this verdict is the unlikely distribution of the award between compensatory and punitive damages. $75,000,000.00 to $1.00 is quite a ratio. Not unexpectedly, the defendant has filed post-trial motions.

The motion of the defendant, briefly outlined, is as follows: it seeks judgment notwithstanding the verdict because (1) plaintiff's patent is invalid as a matter of law; (2) no causal connection has been established between any action of the defendant and any damages of the plaintiff; (3) the invention is not entitled to protection under the law of unfair competition because no

one, including defendant or plaintiff, has put the invention to any use; (4) under the doctrines of merger, laches, waiver and estoppel, the breach of confidentiality agreement claim should be dismissed; (5) the finding that Proler was the inventor is not supported by the record; and (6) based on Wisconsin law and 35 U.S.C. § 285, it should be granted attorney's fees and expenses because the lawsuit was frivolous. Alternatively, defendant asks for a new trial because (1) the verdict as a whole, and particularly the damage award, reveals that the jury failed to understand the issues or the evidence; (2) the verdict as to damages is so excessive as to be perverse, grossly excessive and punitive; (3) the verdict as a whole is contrary to law and the weight of the evidence; and (4) the jury was incorrectly instructed respecting the issue of the validity of the patent. The discussion of these issues will be organized as the verdict was.

■ The first question on the verdict involved the inventorship of the process described in the Proler patent. Defendant claims that no reasonable jury in the light of the evidence could have come to the conclusion that as between Proler and Eickelberg, Proler was the inventor. On that point, the motion is denied. This is most clearly a question of credibility. Substantial evidence exists to support the verdict. Proler testified for several days, in part regarding the mental process involved in his invention. The jury was free to buy his story rather than Eickelberg's.

Defendant also seeks judgment notwithstanding the verdict on the issue of the invalidity of the patent. Defendant asserts that the final determination of obviousness is a question of law for the court. Alternatively, defendant seeks a new trial on the basis that the jury was improperly instructed.

The Court of Appeals for the Federal Circuit has several times recently articulated the rather intricate relationship between the roles of the judge and the jury on the issue of patent invalidity. Specifically discussing the submission of the obviousness issue to a jury, the Federal Circuit stated in *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1515 (1984):

> Thus, it is neither error nor dangerous to justice to submit legal issues to juries, *the submission being accompanied by appropriate instructions on the law from the trial judge.*

One of defendant's contentions in its motion for a new trial is that this jury was improperly instructed. The instruction was:

> ... mere failure of the Examiner to cite certain information or documents in the file wrapper, however, does not necessarily mean it was not considered by the Examiner, who may have considered it and decided that it was unworthy of citation.

Defendant's claim that this instruction was improper is based on language in *Medical Laboratory Automation, Inc. v. Labcon, Inc.*, 670 F.2d 671, 673 (7th Cir.1981), which states:

> This court's decisions are clear that we may not safely assume that the Examiner considered an example of prior art if it is not cited. We can only presume that it was overlooked.

■ Defendant's argument may well have carried the day prior to the existence of the Court of Appeals for the Federal Circuit. However, now with patent appeals being heard by the Federal Circuit, presumably their pronouncements must be heeded. In *Lear Siegler, Inc. v. Aeroquip Corp.*, 733 F.2d 881, 885 (Fed.Cir.1984), the court stated:

> The failure to cite specific prior art is not conclusive proof that the art was not considered. *Solder Removal*, 582 F.2d at 633 n. 9....

Note 9 of *Solder Removal* [*Solder Removal Co. v. United States Int'l Trade Comm'n*, 582 F.2d 628 (C.C.P.A.1978)] specifically states that:

> Mere failure to cite certain prior art does not necessarily mean it was not considered by the Examiner, who may have considered it unworthy of citation.

The jury instruction complained of was not erroneous. It does not constitute grounds for granting a new trial.

In *Perkin-Elmer Corp. v. Computer Vision Corp.*, 732 F.2d 888, 893 (Fed.Cir. 1984), the court summarizes the law with regard to motions for judgment notwithstanding the verdict on the issue of patent invalidity:

> When a party moves for JNOV, the trial court must consider all the evidence in a light most favorable to the non-mover, must draw reasonable inferences favorable to the non-mover, must not determine credibility of witnesses, and must not substitute its choice for that of the jury between conflicting elements in the evidence. (citations omitted). Following those guidelines, the court determines whether the evidence so viewed constitutes "substantial evidence" in support of the jury's findings and, if so, whether those findings can support the legal conclusions necessarily drawn by the jury in accord with its instructions en route to its verdict. (citation omitted). "Substantial" evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review. (citations omitted). In sum, only when the court is convinced upon the record before the jury that reasonable persons could not have reached a verdict for the non-mover, should it grant the motion for JNOV. (citation omitted).

> In its review, the district court must not lose sight of the presumption of validity. (citation omitted). Where, as here, there is a verdict of validity, the question is not whether the patentee had introduced sufficiently substantial evidence to support the verdict, but whether the challenger's evidence so met the burden imposed by 35 U.S.C. § 282 ("[t]he burden of establishing invalidity of a patent or any claim shall rest on the party asserting such invalidity") that reasonable jurors could not have concluded that the challenger failed to overcome that burden. (citation omitted).

Applying these principles in considering the motion for judgment notwithstanding the verdict, I start by recognizing that the Proler patent enjoys a presumption of validity. The burden in overcoming the presumption is on the defendant. In attempting to carry that burden here, Modern relied on two items of prior art not cited by the Patent Examiner: Russian Patent No. 304,302 and the textbook "Induction Machines for Special Purposes" by E.R. Laithwaite, published in 1966. These items, defendant asserts, make the patent invalid for obviousness, or alternatively, anticipate the patent.

The issue of whether these references are more relevant than the prior art submitted to the Examiner was debated, in the usual manner, by the expert witnesses at trial. Defendant would have me defer to its experts on this issue: "In any dispute between Elliott, who is a metallurgist/economist and disavowed any expertise in magnetism, and Block, an expert in both magnetism and metallurgy, one looks to Block for guidance." I do not think it is that simple. Substantial evidence in the record supports the verdict of the jury on the issue. Professor Elliott testified at length, and the jury was free to accept his views.

Defendant also seeks judgment notwithstanding the verdict, dismissing the claims for breach of the confidentiality agreement on the basis of the doctrines of merger, laches, waiver and estoppel. Defendant claims that all agreements between the parties were merged in the July 1973 agreement which, in defendant's view, divided the rights of the parties: the rights to processing ores and oxides were granted to Proler, and the rights to the melting technology was reserved to Modern.

Plaintiff, on the other hand, contends that he negotiated the 1973 agreement at a disadvantage because defendant had filed a patent application in September 1972 which would, in Proler's view, preclude him from obtaining protection of his process. He claims that this disadvantage precludes any finding that the previous agreements were merged in the 1973 con-

tract. The record, which contains lengthy testimony regarding the 1973 contract and the negotiations involved, does not support a finding that the previous contracts were merged into the 1973 agreement.

■ Modern further contends that even if Proler's rights were not fully extinguished by the 1973 contract, he has failed to diligently pursue them. That argument also cannot be sustained on the record of this case.

■ As to defendant's bold claim that this lawsuit was frivolous, I have already written to defendant's counsel immediately following the submission of the motion and asked:

> Considering the fact that the jury saw fit to award $75,000,000.00 to the plaintiff, wouldn't it be a bit presumptuous on my part to follow your reasoning beginning on page 39 and find that the lawsuit is frivolous?

Counsel wrote back that although they were "admittedly optimistic" they recognize that a determination on this claim would require granting of the motion for judgment notwithstanding the verdict. Whatever the bottom line turns out to be in this case, it would be wrong at this stage to grant Modern's request that I make a finding that this is a frivolous lawsuit.

My comments thus far can be summarized by saying that evidence in the record exists to support the verdict on liability. That is, the jury could have concluded that Proler was the one who invented the process and that he had revealed—under his belief that he was protected by a confidentiality agreement—technological secrets to Modern. They could have believed that Modern went behind Proler's back and filed a patent on his invention. Beyond that, the jury must have for some reason believed that Proler discovered Rumpelstiltskin's secret for spinning straw into gold.

As to damages, the case is no longer a "whodunit," a mystery; instead, it is a fairy tale. If one closes one's eyes to reality, perhaps it can be said that there is testimony in the record to support it.

However, the testimony given by Dr. Elliott is based for the most part on sheer speculation. His analysis, set forth in Plaintiff's Exhibit 1080, is based on the possible use of a process which is in Dr. Elliott's own words not developed to the point where it is commercially usable, and a process which no one has made more than token efforts to develop.

In addition, in order to award damages it is necessary to cross the bridge from a finding of liability. One must believe that Modern caused Proler's damages. To arrive at the figure it did, the jury had to believe that almost every company in America dealing in the reclamation of scrap would have used the "Proler Process" but for the "cloud" cast on his patent by Modern's foreign patents—patents which, it must be remembered, Modern offered to assign to Proler.

Common sense is offended by the verdict. Dr. Elliott based his calculation on a royalty fee of ten percent of the cost advantage in using the Proler process. According to the logic of the jury verdict then, the Proler process could save the industry ten times $75,000,000.00. Surely were that based on reality rather than myth, some company would have looked beyond a patent problem and attempted eagerly to help Proler develop the process. In fact, if Proler were convinced that his process was that valuable, it seems more than likely that he would have accepted Modern's offer of its foreign patents, and thus remove any possible cloud on his United States patent. His statement that to do so would be to join in Modern's fraud is simply not convincing. The inevitable conclusion is that the process is simply not as valuable, in fact not even close to being as valuable, as Dr. Elliott's speculation could lead one to believe.

■ If the jury award in this case had been $1.00 for compensatory and $75,000,000.00 for punitive damages it would still be excessive as a whole, but at least it would be somewhat more understandable. As it is, however, the award for compensatory damages is clearly excessive. It sim-

ply cannot be sustained. Because I find the damages to be excessive, I could grant a limited new trial or offer Mr. Proler a remittitur option, as the award does not appear to have been motivated by any prejudice on the part of the jury against Modern. A remittitur, however, would only be in the $100,000–$200,000 range, and because a sum in that area is so far removed from what the jury awarded, I decline to offer an option.

Accordingly, all objections to the jury verdict, with the exception of its compensating damage award, are overruled. The award for compensatory damages is vacated. A new trial, limited only to the issue of compensatory damages, is ORDERED.